No. 32,213

E. McDermed, *Appellee,* v. Arthur L. Ackley et al., *Appellants,* E. J. Reardon, *Defendant,* and Chaparral Oil Company, *Appellant* and *Appellee.*

(44 P. 2d 274)

Opinion filed May 4, 1935.

*Walter F. Jones, C. E. Chalfant, C. E. Branine* and *H. R. Branine,* all of Hutchinson, for appellants Arthur L. Ackley *et al. Charles G. Yankey, Harvey C. Osborne, John G. Sears, Jr., Verne M. Laing* and *G. K. Purves, Jr.,* all of Wichita, for appellant Chaparral Oil Company.

*A. C. Malloy, Roy C. Davis, Warren H. White* and *Frank S. Hodge,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

Burch, J.: The action was one by E. McDermed against Arthur L. Ackley, Helen Ackley and Mary C. Ackley to compel specific performance of a contract to sell oil royalty. The Ackleys had conveyed to E. J. Reardon, who had conveyed to the Chaparral Oil Company, of Tulsa, Okla. Reardon and the oil company were joined as defendants. Judgment was rendered for McDermed. The court also rendered a judgment protecting interest of the oil company, derived from the Ackleys through Reardon. All defendants except Reardon appeal.

Mary C. Ackley, as life tenant, and her son, Arthur L. Ackley, as remainderman in fee, owned a quarter section of land in the vicinity of Hutchinson. Helen Ackley was Arthur's wife. The landowners possessed fractional oil royalty arising from leases of the land to the extent of what were called for convenience eighty royalty acres. Mary C. Ackley was getting old, Arthur was a railroad section man, the land was mortgaged, the royalty was their only resource for taking care of the mortgage, and they very much desired to dispose of sixty royalty acres. McDermed, who resided in Hutchinson, was a friend of the Ackleys. For a long time he had been a faithful business adviser with respect to their oil interests, and he had rendered them valuable services in that regard.

On January 16, 1934, Arthur Ackley and his wife executed a written instrument giving McDermed a ninety-day option to purchase sixty of the eighty royalty acres for $2,400, or $40 per royalty acre. The grantors agreed to make deeds for any number of royalty acres called for, and to apply all moneys received from sales to discharge of the mortgage on the land, which was of record. Mary Ackley did not sign the option instrument, and it was not recorded. On February 6, 1934, all the Ackleys executed, acknowledged and delivered to McDermed six royalty deeds, blank as to grantee, each for a specified number of royalty acres, and all of them totaling sixty royalty acres. This was done to facilitate sales pursuant to the option.

When the option was granted the land lay in unproved territory. The nearest producing oil well was several miles away. A well had been drilled on the Adam Base farm, about two miles from the Ackley land, but the well was nonproductive. The Ackley royalty had been hawked about the oil and gas Rialto of Kansas, the city of Wichita, until it had no appeal. By getting control of it and by proper handling McDermed hoped to make it attractive and to dispose of it at the option price, plus a profit to himself. The term of the option was fixed at ninety days, to enable him to do this. After obtaining the option, and pursuant to promise he would do so, McDermed made several trips to Wichita in furtherance of advantageous disposition of the royalty.

Those interested in the Base well commenced to deepen it, and out of Wichita came persons to Ackley to see about purchase of royalty. When the option was granted Ackley promised he would refer all such persons to McDermed. Ackley testified he did this, and several persons were named who were referred to McDermed. One of them was a Mr. Oldfather. Oldfather was an independent operator who bought and sold leases and royalties. He saw McDermed, McDermed made him a price of $50 per royalty acre, and Oldfather declined to buy.

Oldfather was acquainted with Homa Wood. They had one or two deals together, and Wood testified Oldfather mentioned the Ackley royalty to Wood. Wood was a lawyer, resided in Wichita, was vice president of the Chaparral Oil Company, and represented his company in Kansas. The principal business of the company was purchase of oil royalties. On January 29, 1934, Wood went to Hutchinson, went to the courthouse, made a pencil abstract of the Ackley land, ascertained where Ackley lived, and went to see him. The McDermed option had not been filed for record.

Wood testified Ackley wanted to sell, made a price of $40 per royalty acre, and Wood wanted to buy; but Ackley said he had a friend with whom he advised concerning oil deals, Wood was a stranger, Ackley had previously encountered considerable trouble, and Ackley might want to consult his friend. It was apparent no deal could be made that day, but Wood said he would see Ackley the next day. The next day Wood could not go to Hutchinson, and he communicated with Ackley by telephone. Wood testified as follows:

"I told him it wasn't possible for me to come to Hutchinson to-day to see him about this royalty, and I said, 'I am calling you to advise you about it.'

I said, 'Have you made any deal on it?' He replied, 'No.' I said, 'Is your royalty still for sale?' He said, 'Yes.' I said, 'What price?' He said, '$40 an acre.' 'Well,' I said, 'I will try to be up to-morrow and we will make the deal.' He said, 'There is no use for you to come; you cannot deal with me.' I was astonished, and asked him why I could not make a deal with him, and he replied that he did not care to deal with a man who demanded that certain things be done by him with his money, and I said, 'You mean that mortgage?' And he said, 'Yes.' 'Well,' I said, 'Don't you understand that a man putting good money into that royalty with a mortgage coming due next year would want it free and clear?' He said, 'My land is mortgaged, but my royalty isn't mortgaged.' I saw there was no use to waste further telephone cost with him, so I said, 'Very well, good day, Mr. Ackley,' and I never saw him again about it."

McDermed's option provided for application of proceeds of sale of royalty to discharge of the mortgage. The testimony of Ackley, of Mrs. Ackley, of Mary C. Ackley and of McDermed, was all to the same effect, namely: that proceeds of sale were to be applied on the mortgage. There was no other thought in the mind of anybody. The sale to Reardon included application of proceeds of sale to payment of the mortgage, and the district court was authorized to reject Wood's testimony concerning what prevented sale to Wood. Ackley was not called to corroborate Wood. Wood admitted that in his personal interview with Ackley, Ackley said he might want to consult a friend with whom he advised concerning oil deals. That friend was McDermed, who controlled the royalty and was pricing it at $50 per royalty acre. Ackley testified he referred all inquirers to McDermed. That included Wood, and Wood testified that in the telephone conversation Ackley told Wood that Wood could not deal with Ackley. Therefore the court was authorized to believe Wood's testimony was invented to avoid admission of knowledge of McDermed's unrecorded option.

In deepening the Base well a previously unknown oil-bearing sand was struck, the well became productive, and there was excitement in Wichita. The next day after the Base well came in Wood and Oldfather went together from Wichita to the well, in Wood's car. From the well they went to Hutchinson. At Hutchinson they separated. The discovery at the Base well was an outstanding discovery, and the prices of oil royalties in the vicinity were certain to go up. Wood went to see Base. Oldfather went to see McDermed.

Oldfather told McDermed he was representing a man who was in town with Oldfather. Oldfather could talk with the man and could

let McDermed know if the man would accept a price McDermed would fix. At that time McDermed had just about completed arrangements to take the Ackley royalty himself, and he made a price to Oldfather of $300 per royalty acre, which was confessedly more than the royalty was worth. That evening Oldfather and Wood returned to Wichita together in Wood's car. Wood gave the following remarkable testimony:

"Q. Did it occur to you at all for a moment that Mr. Ackley may not have sold his royalty, this same royalty you were working on, a month or so before? Did you think about that? A. No, I don't think so.

"Q. You did not even think about that Ackley land? A. No, sir.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Mr. Oldfather did not tell you anything about what he had done that day? A. Not that I recall."

The record shows that McDermed subpœnaed Oldfather and paid him mileage and witness fees for one day's attendance. Pursuant to the subpœna, Oldfather appeared on the first day of the trial. The next morning he was gone.

It was perfectly plain that the only way to get hold of the Ackley royalty was to go around McDermed. This was accomplished through Reardon, also of Wichita. Reardon went to Hutchinson and saw Ackley. Reardon had tried to buy of McDermed before, but had not succeeded, and in this instance the obstacle to purchase from Ackley was the McDermed option. Various attorneys were consulted, and it must be said to the credit of the Hutchinson attorneys that not one of them joined in the scheme to circumvent McDermed. Finally, on Thursday, March 15, or Friday, March 16, Reardon succeeded in obtaining Ackley's agreement to sell sixty royalty acres to Reardon for $3,600, or $60 per royalty acre. On Friday afternoon Wood agreed to buy from Reardon the Ackley royalty for $60 per royalty acre and to pay Reardon $5 per royalty acre profit to Reardon. On the morning of Saturday, March 17, as soon as the bank opened, Wood gave his check to Reardon for $3,600, to be paid to the landowners, and Reardon executed his deed to Wood's company, and delivered it to Wood, all at the Fourth National Bank in Wichita. However, the deal was to be closed at the Bisonte Hotel in Hutchinson at noon that day. Wood and Reardon proceeded to Hutchinson. Wood again went to the office of the register of deeds and checked the Ackley title. The deal was closed as contemplated at the hotel at noon, and Ackley's deed to Reardon and Reardon's deed to Wood's company were promptly filed for record.

Wood testified Reardon was a stranger to Wood. Wood had never heard of Reardon until Reardon called Wood by telephone on Wednesday to find out if Wood would be interested in purchasing "this royalty." It does not take a mind reader to know that Wood went to Hutchinson on Saturday and inspected the record to see if McDermed had filed his option for record.

Reardon was a defendant in the case, filed a false answer that he had no information of any kind relating to McDermed's option, and prayed in his answer that McDermed take nothing by his petition. Reardon, although present at the trial, did not take the witness stand. It would have been fatuous for him to deny that an attorney at Hutchinson was called out of a picture show at night for consultation with reference to McDermed's option as an obstacle to purchase by Reardon, and Reardon was not called to corroborate Wood.

McDermed promptly made tender of the option price to Ackley, and on March 19 commenced action to set aside the Ackley deed to Reardon and Reardon's deed to the oil company, and to compel specific performance of the option contract. The Ackley royalty became of great value, and what would otherwise be small points are argued with great vigor. When the facts are known the law questions are simple, and the court will dispose of all but one of them briefly.

While Mary C. Ackley did not sign the option, she executed the royalty deeds of February 6, the purpose of which she understood. There were two considerations for the option contract, payment for services previously rendered and special promises made by McDermed when he took the option, which he fulfilled. The Chaparral Oil Company was a purchaser with notice of the McDermed option. The Chaparral Oil Company is not in position to question the equity of specific performance of the option contract, and if it were, specific performance was equitable.

The remaining law question relates to a matter of pleading. By their pleadings and at the trial the Ackleys joined with the oil company to defeat McDermed. The Ackleys continued in this attitude by post-decision motions and by taking an appeal to this court from the rulings from which the oil company appealed. Afterward the Ackleys commenced to see as in a glass, but not darkly. They deserted the oil company and took a separate appeal from the judgment in favor of the oil company and against them. In this court they abandoned what was in effect a joinder with the oil company in

appeal from the judgment in favor of McDermed. As a matter of fact, they have entered into a contract with McDermed with respect to what they shall do, if the judgment in favor of the oil company and against them shall be affirmed.

It will be recalled the Ackleys had eighty royalty acres. They granted to McDermed an option to buy sixty unsegregated and unidentified royalty acres for $40 per acre. Then they deeded to Reardon sixty unsegregated and unidentified royalty acres for $60 per acre and received the money. McDermed's $2,400 were paid into court. The Ackley deed to Reardon and the Reardon deed to the oil company were warranty deeds, and the Ackleys had royalty acres with which to make good sale of twenty royalty acres to Reardon, and by Reardon to the oil company, after giving McDermed sixty royalty acres. The court confirmed title in the oil company to twenty royalty acres and ordered the $2,400, paid by McDermed, to be held for use and benefit of the oil company. In their second appeal, the Ackleys say the judgment in favor of the oil company was void, not merely erroneous, but void for a single reason: The judgment was not within the issues.

McDermed's petition prayed that his title to sixty royalty acres be quieted. The oil company's answer pleaded the Ackley deed to Reardon, and attached a copy as exhibit A, pleaded the deed from Reardon to the oil company, and attached a copy as exhibit B, and alleged the oil company was the owner of an undivided three-eighths interest in all oil produced from the Ackley land, which was described. The prayer of the answer follows:

"Wherefore this defendant prays that the plaintiff take nothing by his petition and that this answering defendant be adjudged and decreed to be the owner of an undivided three-eighths (⅜) interest in and to all the oil, gas and other minerals in and under [description of land] for a period of fifteen (15) years from March 17, 1934, and so long thereafter as oil or gas may be produced from said land in paying quantities in accordance with the terms and provisions of exhibits A and B hereto attached, and that this answering defendant recover its costs herein, and for such other and further relief as to the court may seem just and equitable."

The answer of the Ackleys expressly admitted execution of their deed to Reardon. The prayer of the oil company for relief did not stop with asking that McDermed take nothing, and did not ask for any decree that the oil company was the owner of the same sixty royalty acres on which McDermed had an option. Based on pleaded facts, the prayer was for a decree that the oil company was the

owner of sixty royalty acres. All parties were in a court of equity and were demanding equitable relief. Even the Ackleys did that. When the court reached formulation of a decree, the oil company was entitled to recover sixty royalty acres as against the Ackleys. The court could not grant full relief, and under well-understood equitable principles, it granted relief to the oil company as far as possible.

The Ackleys are quite mistaken in saying the relief granted was not within the issues made by the pleadings. The issue was unmistakably tendered by the oil company's answer. The Ackleys were privileged to contest or not, as they chose. What happened was, the Ackleys were so intent on defeating McDermed they did not dispute what the oil company claimed. They cannot now mend their hold.

The judgment of the district court is affirmed.